J. S09014/15 & J. S09015/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  H.B., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| APPEAL OF:  M.B., NATURAL MOTHER, : | |
| : | No. 1361 WDA 2014 |
| Appellant : | |

Appeal from the Order, July 17, 2014,
in the Court of Common Pleas of Erie County
Domestic Relations Division at No. 127 of 2013

| | |
|---|---|
| IN THE INTEREST OF:  D.B., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| APPEAL OF:  M.B., NATURAL MOTHER, : | |
| : | No. 1362 WDA 2014 |
| Appellant : | |

Appeal from the Order Entered July 17, 2014,
in the Court of Common Pleas of Erie County
Criminal Division at No. 128 of 2013

| | |
|---|---|
| IN THE INTEREST OF:  R.B. III, A : | IN THE SUPERIOR COURT OF |
| MINOR : | PENNSYLVANIA |
| : | |
| APPEAL OF:  M.B., NATURAL MOTHER, : | |
| : | No. 1363 WDA 2014 |
| Appellant : | |

Appeal from the Order, July 17, 2014,
in the Court of Common Pleas of Erie County
Criminal Division at No. 129 of 2013

IN THE INTEREST OF:  B.G.B., A/K/A :   IN THE SUPERIOR COURT OF
M.B., A/K/A M.B., A MINOR     :       PENNSYLVANIA
                             :
APPEAL OF:  M.B., NATURAL MOTHER,  :
                             :      No. 1364 WDA 2014
            Appellant     :

Appeal from the Order, July 17, 2014,
in the Court of Common Pleas of Erie County
Domestic Relations Division at No. 130 of 2013

IN THE INTEREST OF:  H.B., A MINOR  :   IN THE SUPERIOR COURT OF
ADJUDICATED DEPENDENT     :       PENNSYLVANIA
                             :
APPEAL OF:  R.B. II, NATURAL    :
FATHER,                     :
                             :      No. 1365 WDA 2014
            Appellant     :

Appeal from the Order Entered July 17, 2014,
in the Court of Common Pleas of Erie County
Criminal Division at No. 127 of 2013

IN THE INTEREST OF:  M.B., A MINOR  :   IN THE SUPERIOR COURT OF
ADJUDICATED DEPENDENT     :       PENNSYLVANIA
                             :
APPEAL OF:  R.B. II, NATURAL    :
FATHER,                     :
                             :      No. 1366 WDA 2014
            Appellant     :

Appeal from the Order Entered July 17, 2014,
in the Court of Common Pleas of Erie County
Criminal Division at No. 130 of 2013

J. S09014/15 & J. S09015/15

IN THE INTEREST OF:  R.B. III, A       :       IN THE SUPERIOR COURT OF
MINOR ADJUDICATED DEPENDENT            :              PENNSYLVANIA
                                       :
APPEAL OF:  R.B., NATURAL FATHER,      :
                                       :        No. 1367 WDA 2014
                   Appellant           :


Appeal from the Order Entered July 17, 2014,
in the Court of Common Pleas of Erie County
Criminal Division at No. 129 of 2013


IN THE INTEREST OF:  D.B., A MINOR  :       IN THE SUPERIOR COURT OF
ADJUDICATED DEPENDENT               :              PENNSYLVANIA
                                    :
APPEAL OF:  R.B. II, NATURAL        :
FATHER,                             :
                                    :        No. 1368 WDA 2014
                Appellant           :


Appeal from the Order, July 17, 2014,
in the Court of Common Pleas of Erie County
Criminal Division at No. 128 of 2013


BEFORE:  FORD ELLIOTT, P.J.E., BOWES AND ALLEN, JJ.


MEMORANDUM BY FORD ELLIOTT, P.J.E.:              **FILED APRIL 10, 2015**

M.B. ("Mother") and R.B. II ("Father") ("the parents") appeal the

orders dated July 17, 2014, that changed the permanency goals for H.B.,

D.B., R.B. III, and B.G.B. ("the Children") from reunification with parents

with a concurrent goal of adoption, to adoption.  We have consolidated the

cases ***sua sponte***.  After careful review, we affirm on the basis of the trial court opinion.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Mother raises three questions on appeal:

> 1.  DID THE JUVENILE COURT COMMIT AN ABUSE OF DISCRETION AND/OR ERROR OF LAW WHEN IT DETERMINED THAT THE CONCURRENT PLACEMENT GOAL OF REUNIFICATION/ADOPTION WAS NO LONGER FEASIBLE, DISPENSED WITH THE CONCURRENT PLACEMENT GOAL OF REUNIFICATION AFTER LESS THAN NINE MONTHS AT NUMBERS 1362-1364 AND AFTER LESS THAN FIVE MONTHS AT NUMBER 1361, AND DIRECTED THE AGENCY TO PROVIDE NO FURTHER SERVICES AND/OR VISITATION TO M.B.?
>
> 2.  DID THE JUVENILE COURT COMMIT AN ABUSE OF DISCRETION AND/OR ERROR OF LAW WHEN IT DENIED THE GUARDIAN AD LITEM'S REQUEST TO SPEAK DIRECTLY TO THE NINE-YEAR-OLD CHILD ABOUT WHETHER SHE DESIRED TO RETURN HOME TO HER MOTHER?
>
> 3.  DID THE JUVENILE COURT COMMIT AN ABUSE OF DISCRETION AND/OR ERROR OF LAW WHEN IT IDENTIFIED NON-RELATIVE FOSTER PARENTS AS THE ADOPTIVE RESOURCE FOR THE CHILDREN DESPITE THE EXISTENCE OF SUITABLE AND WILLING BIOLOGICAL RELATIVES AND WAS THE JUVENILE COURT'S PLACEMENT DECISION CONTRARY TO THE EVIDENCE PRESENTED?

Mother's brief at 14.

Father raises one general question on appeal:

> Whether the trial court erred by changing the goal to adoption[?]

Father's brief at 2.[1]

After a thorough review of the record, the parent's briefs, the applicable law, and the thorough, well-reasoned opinion of the trial court, we conclude there is no merit to any of the issues the parents have raised on appeal. The trial court's 43-page opinion properly disposes of the questions presented. Accordingly, we affirm on the basis of the trial court's opinion.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/10/2015

---

[1] We note Father's statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(b) raised four issues: (1) the trial court erred in changing the goal to adoption because the testimony and evidence presented at the time of the hearing was insufficient to support such a change; (2) the trial court erred by finding that Father was not compliant with his family service plan because the testimony and evidence presented at the hearing was insufficient to support such a finding; (3) the trial court erred in admitting hearsay evidence as proof of Father's non-compliance with his family service plan; specifically, the out-of-court statements of Auglaize County Social Service Supervisor Michelle Brown; and (4) the trial court erred to the extent it relied upon Father's asserted non-compliance with his Auglaize County family service plan as proof of non-compliance with his Erie County family service plan, given that, at the time of the hearing, an adjudication/disposition had yet to be held in Auglaize County. In its September 16, 2014 opinion, the trial court addressed each of these issues.

IN THE MATTER OF         : IN THE COURT OF COMMON PLEAS
H.B., D.B., R.B. III, &amp;        : OF ERIE COUNTY, PENNSYLVANIA
B.G.B. a.k.a. M.B.           : JUVENILE DIVISION – DEPENDENCY
Minors                     : No. 127 – 2013, No. 128 – 2013, No. 129 – 2013
                              : No. 130 -2013

## MEMORANDUM OPINION

**September 16, 2014:** This matter is before the Court upon M.B.'s, the natural mother's (hereinafter "Mother"), and R.B. II's, the natural father's (hereinafter "Father"), collective appeals from the July 17, 2014 Orders of Court entered by this Court at Docket Number 127 of 2013 (in reference to H.B., a minor child adjudicated dependent); Docket Number 128 of 2013 (in reference to D.B., a minor child adjudicated dependent); Docket Number 129 of 2013 (in reference to R.B. III, a minor child adjudicated dependent); and Docket Number 130 of 2013 (in reference to B.G.B., a.k.a. M.B., a minor child adjudicated dependent).[1] The original goal of permanency was to reunify the children with their parents with a concurrent goal of adoption. However, the July 17, 2014 Orders of Court changed the permanency goal to adoption. This change of goal forms the basis of the appeals filed by Mother and Father. For the reasons set forth below, the instant appeals should be dismissed.

## FACTUAL & PROCEDURAL HISTORY

On September 23, 2013, the Erie County Office of Children and Youth (hereinafter, "OCY") filed an Emergency Protective Order Application in regards to the four children at issue in this case: H.B. (d.o.b. 7/6/2012), D.B. (d.o.b. 10/13/2007), R.B. III (d.o.b. 9/27/2005) and B.G.B. (d.o.b. 10/6/2004). In its Emergency Protective Order Application, OCY made the

---

[1] The caption at Docket 130 of 2013 relating to M.B. was later amended to reflect the name on the child's birth certificate, B.G.B.

1

A-9

following allegations: OCY had received four referrals within one year regarding the family; the parents have an extensive domestic violence history and Father uses alcohol and drugs in the home; no utilities were available at the home; Father was wanted by the Erie Police Department after allegedly biting off the ear of his stepfather, M.R.; the parents constantly yelled at the children and called them vulgar names; the children were not enrolled in any of the local school districts, were currently enrolled in the Jefferson School District in Detroit, Michigan, but had only attended 6 total days of schooling in the previous school year; and the parents were "extremely uncooperative" with OCY's investigation and had a history of moving with the children between New York, Pennsylvania, Ohio, Michigan, and Florida. (*See* September 23, 2013 Emergency Protective Order Applications at ¶ 5).

The Honorable Daniel J. Brabender, Jr. signed an Emergency Protective Order on September 23, 2013 for each of the children, finding that removal of all four of the minor children was necessary for the welfare and best interests of the children and that, due to the emergency nature of the removal and safety considerations of all of the children, any lack of services to prevent removal were reasonable. (*See* attached September 23, 2013 Emergency Protective Order, Exhibit A). The children were placed in the temporary protective physical and legal custody of OCY. Although the petition to place all children in protective custody was granted, only the whereabouts of two of the children, R.B. III and B.G.B., were known. OCY was unable to locate and physically secure D.B. and H.B. R.B. III and B.G.B. were placed in a confidential foster home.

Subsequently, a Shelter Care Hearing was held before the Juvenile Master, Carrie Munsee, Esquire, on September 26, 2013. Present at the hearing were Amy E. Jones, Esquire, on behalf of OCY; William F. Scarpitti, Jr., Esquire, as guardian ad litem for the children; and

2

Mother, represented by Jessica A. Fiscus, Esquire. Father was not present and was not represented by counsel. Attorney Jones represented to the Master that only R.B. III and B.G.B. were in the current protective custody of OCY. D.B. was placed in protective custody in Monroe County, Michigan, and the whereabouts of H.B. were still unknown. Consequently, OCY withdrew the shelter care applications for D.B. and H.B. The parties stipulated to the continued placement in a confidential foster home for R.B. III and B.G.B. pending an adjudication hearing. Master Munsee consequently recommended the continued placement of the children, which was subsequently ordered by this Court on October 7, 2013.[2]

A Dependency Petition for each of the children was subsequently filed on September 27, 2014. The Dependency Petitions repeated the allegations as set forth in the Emergency Protective Order Application, but also specified that Mother has untreated drug and alcohol issues; that Father has untreated mental health, drug and alcohol issues; that the children have not consistently attended school in two years; that the parents did not have a safe home for the children, were potentially homeless, and had recently been staying in a hotel room with unsafe conditions with the children; Mother did not know the location of H.B.; and Father's whereabouts were unknown but it was believed he had access to the children. (*See* September 27, 2014 Dependency Petitions at 3-4).

A combined Adjudication and Dispositional Hearing was held before this Court on October 23, 2013 for R.B. III and B.G.B. only. D.B., at the time, was in the custody of Monroe

---

2 Master Munsee mistakenly prepared a recommendation for H.B., even though he was not in the protective custody of OCY at the time of the Shelter Care Hearing, and did not prepare a recommendation for R.B. III. She prepared an amended recommendation for both children on November 19, 2013 and this Court adopted the amended recommendations that same day.

3

County Children Services in Michigan. H.B.'s whereabouts were still unknown. Present for the hearing were OCY Solicitor, Anthony G. Vendetti, Esquire; Ken Parmerter, caseworker for OCY; John Neubert, intake specialist for OCY; Raquel L. Taylor, Esquire, guardian ad litem for the children; and Elizabeth Brew Walbridge, counsel for Mother. Noteworthy was the fact that both Mother and Father did not appear for this hearing.

At the hearing on October 23, 2013, the Court Summary was made part of the record without objection. (*See* Notes of Testimony, hereinafter "N.T." October 23, 2013 Adjudication/Dispositional Hearing at 4). The Court Summary indicated that OCY had attempted to locate and service the needs of the family since July 2012. (October 23, 2013 Court Summary at 8). On July 8, 2012, OCY received a referral regarding home conditions. (*Id.* at 6, 7). However, an intake investigation was unable to be completed because, as John Neubert, OCY intake specialist, would later testify, the family relocated. (*See* N.T. April 15, 2014 Adjudication/Dispositional/Permanency Hearing at 37). On August 16, 2012, OCY received a referral regarding home conditions, domestic violence, truancy, and lack of adequate shelter. (*Id.* at 7). The referral was closed at the intake level due to the family fleeing to Ohio, and OCY referred the case to Ohio child protective services. (*Id.*). OCY received a third referral on October 8, 2012 regarding home conditions, domestic violence, truancy, and lack of adequate shelter. (*Id.*). The referral was closed at the intake level because OCY was again unable to locate the family. (*Id.*). A fourth referral was made to OCY on August 30, 2013, regarding home conditions, domestic violence, truancy, drug use by the parents and lack of adequate shelter. (*Id.* at 7, 8). When the family was finally located in Erie, OCY sought a Court Order to detain R.B. III and B.G.B. and began working with police and child protective service agencies in Ohio and Michigan to locate and transport D.B. and H.B. to Erie. (*Id.* at 8). After R.B. III and B.G.B.

4

were detained, they began attending school in the Meadville School District located in Crawford County, Pennsylvania. (*Id.* at 2, 3). Both children were "clearly behind academically" and were referred for speech therapy. (*Id.*). It was reported both children had attended school for a total of twelve days during the last two school years. (*Id.*). Do.B. and A.B., maternal grandparents (hereinafter referred to as "Grandfather" and "Grandmother" respectively, and collectively as "Grandparents"), were listed as potential kinship resources. (*Id.* at 8).

Further, it was represented by counsel at the Adjudication/Dispositional Hearing that Mother was not present because she was incarcerated in Monroe County, Michigan on parental kidnapping charges. (N.T. October 23, 2013 Adjudication/Dispositional Hearing at 5). Father's whereabouts were unknown, but it was represented he had a warrant for his arrest in Monroe County, Michigan, also for parental kidnapping charges. (*Id.* at 5-6).

The Court heard testimony from Mr. Neubert, OCY intake specialist, who testified that the averments contained in the Dependency Petition were true and correct to the best of his knowledge. (*Id.* at 5). He further testified that B.G.B. had an expunged dependency record wherein the case was closed after the family moved to Ohio. (*Id.* at 9). The Court made a finding that R.B. III and B.G.B. were dependent children without proper parental care or control without objection. (*Id.* at 8). Consequently, in the October 24, 2013 Orders of Court, the Court adjudicated both children dependent. Temporary legal custody of the children was transferred to OCY and the children were to remain in confidential foster care. (October 24, 2013 Orders of Court at 2). The permanency goal was established as reunification with the parents and a concurrent goal of adoption. (*Id.*). The treatment plan for Mother and Father ordered both to participate in a psychological evaluation; a drug and alcohol evaluation; follow all recommendations of the evaluators; complete an OCY-approved parenting class; complete an

5

OCY-approved domestic violence class; obtain safe and stable housing and provide OCY with a current address and phone number; obtain gainful employment; and attend appointments and be actively involved in the medical, developmental, and behavioral treatment of the children. (*Id.* at 3). Mother was to fulfill her obligations once she was released from prison, but was to avail herself of any service program available to her while incarcerated. (*Id.*). Father was additionally to address any outstanding bench warrants. (*Id.*). A six month permanency review hearing was scheduled.

Subsequently, this Court, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (23 Pa.C.S. §§ 5400 *et seq.*), specifically 23 Pa.C.S. § 5410 (relating to communication between courts), communicated with the Honorable Frank L. Arnold of the Monroe County Circuit Court in Monroe County, Michigan. Following a discussion with Judge Arnold, it was agreed that jurisdiction of D.B. and H.B. should be transferred to Erie County, Pennsylvania.[3] Consequently, on November 18, 2013, Judge Arnold entered an Order transferring the dependency cases of D.B. and H.B. in the Monroe County Circuit Court to the Erie County Court of Common Pleas. (*See* attached as Exhibit B).

Thereafter, D.B. was taken into OCY's custody on December 16, 2013. OCY filed a Shelter Care Application on behalf of D.B., alleging the parents' extensive history of domestic violence, drug use, transience to avoid children and family services, homelessness, and educational neglect. (Shelter Care Application at Docket 128 of 2013 at ¶ 5). OCY further alleged that following her period of incarceration for parental kidnapping in Michigan, Mother had "disappeared." (*Id.*). OCY also alleged that Father's whereabouts remained unknown, it

---

[3] D.B. was in the protective custody of Monroe County child protective services. H.B.'s whereabouts remained unknown, but a dependency petition regarding H.B. had been filed in the Monroe County Circuit Court.

6

was believed H.B. was in his care and that the state of Michigan "launched a nation-wide search for H.B. but has been unsuccessful in locating him thus far." (*Id.*).

A joint Shelter Care and Adjudication Hearing was held for D.B. before Juvenile Master Munsee on December 19, 2013. Present for the hearing were Attorney Jones on behalf of OCY and Ines M. Massella, Esquire, as guardian ad litem for H.B. Neither Mother nor Father was present, and neither was represented by counsel.[4] Attorney Jones represented that Mother's and Father's whereabouts *remained unknown* and the parents had had no contact with the children. (N.T. December 19, 2013 Shelter Care/Adjudication Hearing at 2-4). Attorney Massella stipulated to a finding of dependency. (*Id.* at 5). Consequently, Master Munsee recommended D.B. be adjudicated dependent, placed in the legal and physical custody of OCY, and be placed in the confidential foster home with R.B. III and B.G.B. (*Id.*). Master Munsee's recommendations for Shelter Care and for Adjudication of D.B. were reviewed and approved by this Court in separate Orders, both dated December 27, 2013.

A Dispositional Hearing was subsequently scheduled for D.B. on January 22, 2014. Present for the Dispositional Hearing were Attorney Vendetti on behalf of OCY; OCY caseworker, Kenneth Parmerter; and Jason R. Owen, Esquire, as guardian ad litem for D.B. Once again, neither Mother nor Father was present. The January 22, 2014 Court Summary was made part of the record without objection. (N.T. January 22, 2014 Dispositional Hearing at 3). The Court Summary indicated that Mother had contacted OCY on December 30, 2014 and told them she was moving to Sandusky, Ohio and she inquired about visiting the children. (January 22, 2014 Court Summary at 5). OCY's attempts to maintain communication with Mother after that were unsuccessful and Mother never called OCY back. (*Id.*). OCY had also been in

---

4 Attorney Walbridge previously withdrew as Mother's counsel due to Mother's failure to maintain contact with her.

communication with Grandparents regarding kinship placement and filed for an Interstate Compact with the state of Ohio, where Grandparents live. (*Id.* at 4).

At the Dispositional Hearing, OCY recommended reunification with the parents and a concurrent goal of adoption. (N.T. January 22, 2014 Dispositional Hearing at 3). OCY further requested that D.B.'s case be consolidated with R.B. III's and B.G.B.'s cases. (*Id.*). The Court, without objection by the parties, consolidated D.B.'s case with the cases of R.B. III and B.G.B. and scheduled a sixty day permanency review hearing. (*Id.* at 6). Consequently, this Court entered the January 28, 2014 Order which transferred temporary legal and physical custody of D.B. to OCY, retained his placement at the confidential foster home with his siblings, and established the permanency goal as reunification with parent concurrent with adoption.

Subsequently, OCY received custody of H.B. on February 14, 2014. A Shelter Care Hearing for H.B. was held before Juvenile Master Munsee on February 18, 2014. Present for the Shelter Care Hearing were Attorney Jones on behalf of OCY; Alyssa Beer, OCY Supervisor; Attorney Owen as guardian ad litem for H.B.; and Jessica A. Fiscus, Esquire, representing Mother. Father was not represented by counsel. Once again, Mother and Father failed to appear. Attorney Jones stated that Father was incarcerated in Ohio and was expected to be extradited to Michigan to face charges there. (N.T. February 18, 2014 Shelter Care Hearing at 2). The parties agreed to H.B.'s placement in confidential foster care with his siblings. (*Id.* at 4). Consequently, Master Munsee recommended that legal and physical custody of H.B. be transferred to OCY and H.B. be placed in foster care. This Court accepted Master Munsee's recommendations by the February 28, 2014 Order of Court.

A combined Adjudication Hearing for H.B., Dispositional Hearing for D.B. and Permanency Review Hearing for R.B. III and B.G.B. was scheduled for April 25, 2014. Present

8

for the hearing were Attorney Jones on behalf of OCY; Mr. Parmerter, OCY Caseworker; Ms. Beer, OCY case supervisor; Attorney Owen as guardian ad litem for the children; Attorney Fiscus on behalf of Mother; and Steven E. George, Esquire, on behalf of Father. The Court permitted Mother and Father to participate by telephone.[5] The March 26, 2014 Adjudication/Dispositional Hearing Court Summary, the March 26, 2014 Review Hearing Court Summary, and the April 25, 2014 Review Hearing Court Summary Addendum were made part of the record, without objection. (N.T. April 25, 2014 Adjudication/Dispositional/Permanency Hearing at 4).

The March 26, 2014 Review Hearing Court Summary contained the children's descriptions of their home life before OCY involvement in this case:

> They have described times of extended transience and moving unexpectedly from place to place and frequently staying in hotels. They describe their parents verbally and physically fighting, having to leave things behind, and seeing drug use by their parents and other associates of their parents. They have also spoken about having to hide from people when they were alone. They were able to detail a list of people and vehicles they have to avoid or hide from if they saw them. When they first arrived at the foster home, [R.B. III] and [B.G.B.] had to be repeatedly reassured that different people from their past were not going to find them or hurt them.

(March 26, 2014 Review Hearing Court Summary at 8).

The March 26, 2014 Court Summary also provided a review of the status of the children. A mental health diagnosis of B.G.B. was completed October 21, 2013 and she was diagnosed with Post Traumatic Stress Disorder, Reactive Attachment Disorder, Learning Disability and Phonological Disorder. (*Id.* at 2). B.G.B. subsequently began outpatient counseling. (*Id.*). Although B.G.B. at age nine should be placed in the fourth grade, she was only in first grade

---

[5] Although granted permission to participate by telephone, Father remained silent because of his pending criminal charges in Michigan. (*See* N.T. April 25, 2014 Adjudication/Dispositional/Permanency Hearing at 56). Also, this was the only hearing Father ever 'attended,' albeit by telephone.

9

because of her special needs, and was expected to advance to second grade upon completion of that school year. (*Id.*).

R.B. III also completed a mental health diagnosis on October 21, 2013, and was diagnosed with Post Traumatic Stress Disorder, Learning Disability and Phonological Disorder. (*Id.* at 3). R.B. III also suffers from Encopresis and has difficulty controlling his bowel movements. (*Id.*). R.B. III had begun outpatient counseling and continued to receive speech therapy. (*Id.*). R.B. III was also placed in first grade, but was expected to advance to third grade in the next school year which would be appropriate for his age of eight. (*Id.*). His teacher did report, however, that he was more "socially withdrawn" than B.G.B. (*Id.*).

D.B. did not have a mental health diagnosis, but was receiving speech therapy. (*Id.* at 4). D.B. was entered into kindergarten, which is age appropriate for his age of six, and school staff reported that he had acclimated well to the classroom and routine. (*Id.* at 5).

The March 26, 2014 Adjudication/Dispositional Hearing Court Summary indicated that, previous to finding H.B., OCY made numerous contacts throughout Michigan and Ohio to contact Mother and Father. (March 26, 2014 Adjudication/Dispositional Hearing Court Summary at 5). The Court Summary stated that OCY "learned there was a bank account under the name of [R.B. III], the child, that [Mother] was receiving money from [Grandmother] through, to keep herself financially afloat." (*Id.*). OCY also learned that Mother and Father took the children's items to a pawn shop in Ohio to "gain further financial support for themselves while avoiding the agency and law enforcement." (*Id.*). The owner of the pawn shop was able to identify Father, Mother, and the child and indicated all three had been frequent customers together. (*Id.*).

10

A . 18

OCY utilized several layers of law enforcement to locate Father and H.B., including local law enforcement in Ohio and Michigan, State Police, Highway Patrol and the U.S. Marshal Service. (*Id.*). Eventually, the U.S. Marshal Service located a camper in Auglaize County, Ohio where they believed Father, Mother, and H.B. resided. (*Id.*). On February 14, 2014, U.S. Marshals entered the camper and discovered Father, Mother and H.B. residing there. (*Id.*). Father was taken into custody due to his arrest warrant in Michigan and custody of H.B. was transferred to OCY in Erie County, Pennsylvania. (*Id.*).

OCY also indicated in the Court Summaries that Grandparents' home was viewed "as a positive resource for the children." (*See* March 26, 2014 Review Hearing Court Summary at 8). Grandparents had travelled twice to Erie to visit with the children and had indicated their interest in being a resource. (*Id.*). However, there were concerns because Mother was then living in their home. (*Id.*). Additionally, Grandmother reported "fear of [Father] coming to take the children from her care." (*Id.*).

The Court Summary also detailed the progress of Mother and Father with the permanency plan of reunification. Neither parent had participated in a psychological evaluation, a drug and alcohol evaluation, or participated with OCY in completing parenting or domestic violence classes. (*Id.* at 8-10). Neither had reported any gainful employment. (*Id.* at 9-10). Mother reportedly moved into the home of Grandparents due to the fact that she was pregnant with a due date of March 20, 2014. (*Id.* at 9). Further, OCY did not consider Mother's or Father's housing to be stable. (*Id.*). Father originally provided OCY with an address of 1250 North Dixie High in Monroe, Michigan which is the location of a Knight's Inn Motel. (*Id.* at 10). Moreover, when OCY informed Father that the motel would no longer allow the family to reside there, Father

11

A-19

then gave OCY an address in Sandusky, Ohio he described as "permanent." (*Id.*). However, Father could not remember the street address for this residence. (*Id.*).

OCY also indicated that Mother failed to maintain contact with the agency during the review period. (*See id.* at 9). Thus, Mother went at least three months without contacting OCY. (*See also* January 22, 2014 Court Summary at 5 wherein OCY indicates their last communication with Mother was on December 30, 2013). Afterward, Mother "maintained some contact with [OCY] via phone but has shown little interest in the other children in that, [*sic*] she has not inquired about their health, schooling, or overall wellbeing." (*Id.*). Similarly, Father never contacted OCY. (*Id.* at 10). OCY initiated telephone contact with Father from the Auglaize County Jail in Ohio. (*Id.*). Father also failed to inquire about the children's wellbeing, safety, visitation, or what is expected of him for reunification. (*Id.*) Consequently, based on these factors, OCY recommended a change of goal to adoption. (*Id.* at 11).

According to the April 25, 2014 Court Summary Addendum, phone contact between Father, Mother and the children was initiated, but was stopped due to concerns raised by the foster parents, the children's therapists, and R.B. III. (April 25, 2014 Court Summary Addendum at 1). R.B. III stated he was afraid to speak to Father because he believed Father was going to come and take him away. Alicia Twilla, MS, LPC, R.B. III's therapist, recommended contact between R.B. III and Father should be delayed as long as it continues to be a source of distress for him. (*Id.*). The foster parents also reported that Father became threatening and aggressive on the phone when R.B. III did not want to speak with him. (*Id.*). OCY further indicated Mother and Father had withdrawn from contact and refused to return calls from OCY staff. (*Id.*). All mail sent to the address provided by Mother and Father was returned unopened and undeliverable during the review period. (*Id.*).

12

A-70

At the April 25, 2014 hearing, counsel for Mother raised the issue of the Court's jurisdiction in these cases. (N.T. April 25, 2014 Adjudication/Dispositional/Permanency Hearing at 6-7). Counsel for Father also objected to the Court's jurisdiction. (*Id.* at 9). They argued that jurisdiction was not proper in Erie County, Pennsylvania because the children were not originally from Erie County and Mother and Father resided in Sandusky, Ohio and were currently in Auglaize County, Ohio. (*Id.* at 7). Consequently, the Court heard argument regarding the current location of Mother and Father and whether Ohio, as requested by counsel for the parents, would be a more convenient forum. Mother testified that she and Father lived together at 807 Second Street Sandusky, Ohio, in Erie County, Ohio. (*Id.* at 6). She testified she had lived in Sandusky since July of 2012. (*Id.* at 10). Father testified he also originally moved to Sandusky in July of 2012 but then moved to Michigan to finish trade school in January of 2012. (*Id.*). Father's residence in Monroe Michigan was a Knight's Inn motel where he was staying month to month. (*Id.* at 12). However, at the time of the hearing, both parties were calling from the same telephone, and Mother testified they were in Auglaize County, Ohio but did not state the address where they were located. (*Id.* at 5). Further, the Court presented Courtroom Exhibit 1, correspondence sent to Father at 807 Second Street Sandusky, Ohio, and labeled return to sender. (*See id.* at 12; *see also* Courtroom Exhibit 1). The Court found that Ohio was not a convenient forum and there was no proof of significant contacts between the parties and either Erie County, Ohio or Auglaize County, Ohio. (*Id.* at 16).

The Court subsequently heard testimony from Officer Herbert Lucas of the Millcreek Township Police Department. Officer Lucas testified that on August 16, 2013, M.R., Father's stepfather, came to the Millcreek Police Department to make a statement regarding an assault by Father on July 13, 2013. (*Id.* at 18-19). M.R. alleged that he and Father were in a vehicle

13

A-21

together when a verbal altercation started that became physical and led to Father biting M.R.'s ear, removing a portion of it. (*Id.* at 19). Officer Lucas testified that he was provided with several addresses in Erie County, Pennsylvania for Father, but Father had refused to speak to an investigator. (*Id.* at 20). He further testified that an investigation is still open. (*Id.*).

Next, OCY called Mr. Parmerter to testify. Mr. Parmerter testified that he had been involved in the case since August of 2012, wherein OCY received referrals containing allegations of transience, truancy, lack of adequate shelter and domestic violence. (*Id.* at 22). Mr. Parmerter was asked if OCY ever went to see the homes where the children were residing, and Mr. Parmerter answered:

> Yes. When the agency would receive referrals, intake workers would go out to investigate and go to the homes. The family would become aware of the agency's involvement, and then shortly thereafter we would not be able to find them again. They would be gone.

(*Id.*).

Mr. Parmerter testified the family, at one point, resided in a home on Kelso Drive in Erie, Pennsylvania, which was ultimately condemned. (*Id.*). Later, the entire family lived in a two bedroom hotel room at the Knight's Inn Motel in Monroe, Michigan. (*Id.* at 23-25; *see also* Exhibit A).

Mr. Parmerter further testified the allegations of domestic violence were based on the various allegations received during the intake process. (*Id.* at 26). Mr. Parmerter stated that the parents have not complied with any part of the treatment plan as it pertains to B.G.B., R.B. III, and D.B. (*Id.*). Finally, Mr. Parmerter testified that H.B. had recently developed a medical issue with his platelet count and had to receive steroid treatment at Pittsburgh Children's Hospital. (*Id.* at 27). The parents were informed of H.B.'s condition, but did not present in Pittsburgh for his treatment. (*Id.*).

14

On cross-examination, Mr. Parmerter stated that Mother had completed an intake at Maryhaven, a healthcare facility in Ohio, for a domestic violence evaluation and drug and alcohol evaluation. (*Id.* at 29-30). She did not complete a psychological evaluation because she self-reported no mental health issues. (*Id.* at 30). Mr. Parmerter testified that Mother had phone contact with the children twice each weekend for the time period between H.B.'s detention and right before the hearing. (*Id.*). He also claimed Mother was cooperative in providing H.B.'s medical history to OCY. (*Id.* at 31-32). Mr. Parmerter further testified that OCY was not able to contact Father regarding the treatment plan for the children until his incarceration in February of 2014. (*Id.* at 32). Shortly thereafter, Father also began telephone contact with the children. (*Id.* at 32). These conversations, however, were distressing to R.B. III due to Father's aggressiveness. (*See id.* at 34-26).

OCY next called Mr. Neubert, OCY intake specialist, to testify. He testified that OCY first received a referral concerning the family in June of 2012 regarding domestic violence in the home, educational neglect and drug use of the parents. (*Id.* at 37). Mr. Neubert went to the family address of 2821 Athens Street, Erie, Pennsylvania where Father, B.G.B., and R.B. III were currently present. (*Id.*). Father asked for a card and said his lawyer would contact the agency. (*Id.*). Thereafter, Mr. Neubert testified he was unable to locate the family again. He received several different addresses for the family throughout Erie, Pennsylvania, including the Kelso Drive address, a West 24th Street address, and 3512 Allegheny Avenue (the address of M.R., Father's stepfather). (*Id.*). Mr. Neubert claimed OCY attempted to contact the family at all four of those addresses at least five times without success. (*Id.*).

Mr. Neubert testified that OCY next received a referral in August of 2013 because the children were not enrolled in school. (*Id.* at 38). The case was referred to Monroe County,

15

Michigan because the parents had told the intake worker they had moved there. (*Id.* at 28-29). Subsequently, Mr. Neubert received a call on September 23, 2013, stating the children were in Erie. (*Id.* at 39). Mr. Neubert went to investigate and found B.G.B. and R.B. III at the home of a great maternal aunt in Erie, Pennsylvania. (*Id.*).

Next, Mother testified. She claimed the 807 Second Street, Sandusky, Ohio is her address, that it is a three-bedroom, single-family home, and that she has a roommate living with her there. (*Id.* at 46). She testified that Father does not currently live there. (*Id.*). She testified that when the Monroe County caseworker came to the Knight's Inn Motel room, the family was in the process of moving to an apartment in downtown Monroe, Michigan. (*See id.* at 47-48). Previous to the Knight's Inn motel room, the family lived in the Dearborn, Michigan area for three months. (*Id.* at 47). She testified that the family may return to Michigan so that Father can finish his schooling. (*Id.* at 48). She stated her current residence was at Townline Kossuth Road in Auglaize County, Ohio, but she did not know the street number. (*Id.* at 49). She stated she only planned to stay there until the dependency proceedings regarding her infant daughter and Father's extradition proceedings in Auglaize County were completed. (*Id.*). She also testified that when B.G.B. and R.B. III were detained she was temporarily at her aunt's house in Erie, Pennsylvania to get belongings for the move in Michigan. (*Id.* at 52). She denied ever living at Kelso Drive, Allegheny Avenue or West 24th Street in Erie, Pennsylvania. (*Id.*). However, she also testified that B.G.B. went to kindergarten in Millcreek Township, which is in Erie County, Pennsylvania. (*Id.* at 55).

The Court made a finding that H.B. is a dependent child on the basis of lack of parental care and control. (*Id.* at 57). Specifically, the Court stated:

16

So on that basis I think – home conditions, lack of a permanent and stable residence, the fact that we did have some issues of truancy – in fact, the children weren't enrolled for a period of time, that we had contact here, again giving us jurisdiction, and that there are pending criminal charges against [Father] all rise to the level of lack of parental care and control for an adjudication of dependency for [H.B.].

(*Id.*).

Counsel for Mother opposed OCY's request for a change of goal to adoption and requested all four children have a goal of reunification with parent concurrent with adoption. (*Id.* at 59-60). Counsel for Mother argued that Mother and Father could receive services through the child protective services agency in Ohio. (*Id.*). Consequently, the Court agreed to grant Mother's request and ordered the placement goal for B.G.B., R.B. III, and D.B. remain *status quo*, and the placement goal for H.B. be reunification with parents concurrent with adoption. (*Id.* at 60). The Court further ordered a ninety day permanency review. (*Id.*). These terms were subsequently contained in the May 6, 2014 Order of Court for each of the children.

On May 19, 2014, Mother filed a "Motion to Change Treatment Plan" seeking to remove the requirements of Mother to complete a drug and alcohol evaluation and attend domestic violence classes. (*See* Motion to Change Treatment Plan at ¶ 14). The basis of Mother's motion was that the Court's finding of dependency in regard in H.B. was based on the lack of safe, stable housing, home conditions, truancy, and the father's outstanding criminal matters, not domestic violence or drug and alcohol abuse. (*See id.* at ¶ 10-11). On May 29, 2014, Mother's motion was granted as it pertained to H.B., however, it was denied as to the other children.

On June 9, 2014, Mother filed an appeal in each of the above dockets for the Orders entered May 8, 2014. Counsel for Mother, Jessica A. Fiscus, Esquire, filed a Notice of Appeal

17

with this Court as well as a "Statement of Intention to File an Anders Brief." On June 16, 2014, a praecipe for discontinuance was filed in each case, and the appeals were discontinued.

Subsequently, a Permanency Hearing was scheduled for all four children on July 9, 2014. Present at the hearing were Attorney Jones on behalf of OCY; OCY caseworker Mr. Parmerter; Attorney Owen as guardian ad litem for the children; Mother; Attorney Fiscus as counsel for Mother; and Attorney George as counsel for Father. Father was granted permission to testify by telephone but failed to provide Attorney George or the Court with a telephone number where he could be reached. (N.T. July 9, 2014 Permanency Hearing at 3). The July 9, 2014 Court Summary, correspondence from Grandparents, the treatment therapist assessment for B.G.B., and correspondence from Auglaize County Jobs and Family Services Children Services Unit, (hereinafter "Auglaize County CSU") were all made part of the record, without objection. (*Id.* at 4).

The July 9, 2014 Court Summary indicated that all four children remained in the confidential foster home. (July 9, 2014 Court Summary at 1-5). B.G.B. and R.B. III had both advanced to second grade. (*Id.* at 2-3). Both were receiving trauma focus therapy through Parkside Psychological Services. B.G.B. was being treated due to "concerns with domestic violence and how this is currently manifesting in her behaviors towards her siblings, as well as her overall mental health stability." (*Id.* at 2). R.B. III was being treated due to his "consistent disclosures of domestic violence and drug/alcohol use while in his parent's care, and how these can affect his mental stability." (*Id.* at 3). D.B. had advanced to first grade. (*Id.* at 4). The Court Summary also contained more information concerning H.B.'s April 19, 2014 hospitalization. He was diagnosed with Idiopathic Thrombocytopenia Purpura, "a condition that results in an extremely low white blood cell count." (*Id.* at 5). H.B. has received steroid

18

treatments and was being monitored by the staff from the Meadville Community Center Hospital, but has not required any further hospitalization. (*Id.*).

The July 9, 2014 Court Summary also indicated that, following the previous permanency review hearing on April 25, 2014, Grandparents "stated concerns of their advance age and fear the parents would come and take the children by force." (*Id.* at 7). Consequently, Grandparents withdrew from the process of establishing an Interstate Compact to become a kinship resource. (*Id.*). The paternal grandfather also expressed interest in being a kinship resource but also withdrew. (*Id.*).

According to the Court Summary, subsequent to the April 25, 2014 hearing, OCY had several conversations with Mother and Father to set up visitation and coordinate a new service plan. (*Id.* at 8). The parents first notified OCY that Mother would return to Erie, Pennsylvania, and Father would remain in Ohio. (*Id.*). Subsequently, they stated they both would return to Sandusky, Ohio. (*Id.*) Finally, they notified OCY they would remain in St. Mary's, Ohio, in Auglaize County. (*Id.*). Consequently, OCY coordinated with Auglaize County CSU to design a treatment plan that could be offered in Auglaize County. (*Id.*). However, staff at Auglaize County CSU informed OCY that Mother and Father refused to cooperate with their treatment plan, and Father was no longer allowed on their property due to threats he made against their staff. (*Id.*).

On June 12, 2014, Mother came to Erie to visit with the children. R.B. III allegedly only participated "to protect [his] brothers and sisters." (*Id.*). B.G.B. and D.B. were reportedly excited to see Mother, and H.B. was reportedly detached. (*Id.*). Mother requested another visit for June 27, 2014. (*Id.* at 9). Father did not attend the visit, was extradited to Monroe County, Michigan on June 17, 2014, and was incarcerated at the Monroe County Jail. (*Id.* at 7, 8).

19

OCY reported that Mother scheduled a drug and alcohol evaluation for June 26, 2014, had called and inquired about the well-being of the children, and had scheduled and attended one visitation with the children in Erie. (*Id.* at 9). However, Mother had not participated with the agency in regard to any of the other aspects of her treatment plan and had not established permanent housing or gainful employment, and, consequently, was substantially noncompliant. (*See id.*). Similarly, Father had not participated with the agency in regard to any aspect of his treatment plan and was, therefore, noncompliant. (*See id.* at 9-10). Consequently, OCY recommended a goal change to adoption for all four children. (*Id.* at 10).

At the July 9, 2014 permanency review hearing, OCY called Mr. Parmerter to testify. Mr. Parmerter testified that Father's criminal case in Michigan was resolved, and he was sentenced to time served and a fine. (N.T. July 9, 2014 Permanency Hearing at 6-7). Mother had reported to OCY that she and Father were still residing at 14388 Townline-Kossuth Road, St. Mary's, Ohio. However, staff from Monroe County, Michigan reported to OCY that both parents were living at the Second Street address in Sandusky, Ohio. (*Id.* at 7). Mr. Parmerter further testified that the parents' youngest child, (C.B.), is still in the custody of Auglaize County CSU and the parents reportedly had "very limited participation with their treatment plan" in that case. (*Id.* at 9). Further, Father had to be accompanied by sheriffs at the Auglaize County CSU premises due to threats he made against their staff. (*Id.*).

Mr. Parmerter testified that Father had not seen the children in the last ninety days. (*Id.* at 10). He further testified that Father had not "done anything on the treatment plan or in any way demonstrated that he's appropriate to safely parent these children" at any time that he's been involved in the case, since August 2012. (*Id.*) Mother participated in only two visits within the last three months to include: one supervised visit at the agency, and one supervised visit at the

20

Erie Zoo. (*Id.*). Mr. Parmerter described Mother's visit at the zoo as "more or less appropriate." (*Id.* at 14). Specifically, he testified:

> [Mother] interacted with them for the most part appropriately, was able to keep them from running off and everything. She did have [H.S.] with her, the great aunt, who was assisting her especially with [H.B.], who is very on the go, and [H.S.] was assisting her with [H.B.]. But overall it was a positive visit. [R.B. III] did not – [R.B. III] seemed a little ill at ease, but the rest of the children seemed to be having fun.

(*Id.*).

Mr. Parmerter acknowledged a letter written by the confidential foster parent listing her concerns that Mother was not adequately prepared for the visit. (*Id.* at 14-15).

Mr. Parmerter qualified Mother's compliance as "minimally compliant." (*Id.* at 11). He testified that Mother had completed a domestic violence assessment, but no services were offered because Mother self-reported no problems. (*Id.*). Mr. Parmerter testified that Father had only contacted OCY once and that he did not arrange for any phone contact between Father and the children due to Father's aggressive behavior towards R.B. III. (*See id.* at 18-19).

Mr. Parmerter further testified that the children's foster family was willing to be a resource for adoption and the children were comfortable in their home. (*Id.* at 11-12). Mr. Parmerter stated that Grandfather and Grandmother had been considered a kinship resource until they withdrew from consideration due to a fear of Father and their age. (*Id.* at 12). He testified the Grandparents had visited the children three times and had sporadic telephone contact, and that OCY would continue to facilitate contact between the children and Grandparents (*Id.* at 13).

Next, Mother testified. She stated that she is currently residing at 14338 Townline-Kossuth Road, St. Mary's, Ohio for the dependency case regarding her youngest child, C.B. (*Id.* at 30). She testified that she has completed a drug and alcohol evaluation and a domestic violence evaluation in Auglaize County. (*Id.* at 31). She had not yet begun parenting classes and

21

was waiting on OCY to arrange for payment of the psychological assessment. (*Id.* at 32-33).

Mother further testified that she is living in a trailer and works for the campground, Galaxy

Starlite, in lieu of rent. (*Id.* at 33). When asked whether "that is appropriate housing for you and

the kids," Mother answered, "no." (*Id.* at 34). She stated she is currently searching for a better

job to secure more appropriate housing. (*Id.*). Mother also testified that she is still involved with

Father, but would "have no problem cutting that off," qualifying the relationship as "estranged."

(*Id.* at 37).

On cross-examination, Mother admitted that she was in a domestically violent

relationship with Father. (*Id.* at 40). She claimed it was verbal and not physical domestic

violence. (*Id.*). She also admitted she had no means of financially supporting the children. (*Id.*

at 42).

Mother subsequently called Grandmother to testify. Grandmother testified that she is the

children's maternal Grandmother and is 62 years old. (*Id.* at 47-48). She currently resides at 420

Mill Wood Boulevard, Marysville, Ohio with her husband, Do.B., 64 years old. (*Id.* at 48). She

testified both she and Grandfather are employed. (*Id.*). She testified that only B.G.B. has spent

the night at her home which occurred only once. (*Id.* at 49). Grandmother claimed that she was

never permitted to see the children before. (*Id.* at 50). She further testified that her fear of

Father is not at issue anymore because of a security system in their home and her belief that

Father would not "have the guts to try to come out." (*Id.*).

Finally, Attorney Owen indicated he had received information that B.G.B. was "interested

in returning to her Mother." (*Id.* at 57). He requested "if we could talk to her and ask some

pointed questions about that." (*Id.*). The Court asked Attorney Owen if B.G.B.'s desire to return

to Mother would change his conclusions regarding what was in B.G.B.'s best interest. (*Id.*).

22

Attorney Owen answered, "I think in the best interest it's clear that we should go to adoption on all four." (*Id.*). Consequently, the Court did not have B.G.B. testify.

The Court stated its findings and the reasons for its conclusions on the record:

> The Court: Okay. Let me just, you know, a metaphor, but I don't know if this is correct, it may be too harsh, but I think it's accurate. The cancer to this case is [Father]. I'm going to tell you he's a problem in this case. He already had been accused of kidnapping with [Mother]. He's demonstrated he could be violent. Whether it's verbal or physical, it at least is significant enough that the grandmother and grandfather have demonstrated that they are concerned about him. He wouldn't let them have a relationship; "them" being the maternal grandparents. And as bad as that scenario is, [Mother] is still with him. And nothing has really changed since really nine months ago – well, back in October of 2013; is that right?
> Attorney Jones: Absolutely nothing. That's right.
> The Court: And today we hear – actually we see for the first time [Mother]. We haven't seen [Father] yet, [ ]. So we're no further along for permanency, and the issues that have presented themselves have in no way been alleviated to any extent. And I do think it's somewhat late in the stability of these children to have maternal grandparents back in the picture.

(*Id.* at 55-56).

Consequently, the Court ordered a change in goal to adoption and issued Orders on July 17, 2014 which set forth a permanency review hearing within six months.

On August 18, 2014, Mother and Father both filed four separate Notices of Appeal, one for each docket concerning the four children. Both Mother and Father filed concise statements of errors complained of an appeal with their Notices of Appeal because this case qualifies as a children's fast track appeal pursuant to Pa.R.A.P. 905(a)(2).

## DISCUSSION

Mother raises the same three issues on appeal for each of the following dockets: first at

Docket Number 127 of 2013, in reference to H.B.; second, at Docket Number 128 of 2013, in

reference to D.B.; and finally at Docket Number 129 of 2013, in reference to R.B. III.

Specifically she asserts:

> 1. The Juvenile Court committed an abuse of discretion and/or error of law when it determined that the concurrent permanency goal of reunification/adoption was no longer feasible, dispensed with the concurrent goal of reunification after only nine months,[6] and directed the Agency to provide no further services and/or visitation to M.B. Specifically, the testimony reveals that M.B. made an effort to commence services in Auglaize County, Ohio in the last review period, that M.B.'s ability to participate in a psychological evaluation was hindered by the Erie County Agency's delay in coordinating funding with Auglaize County, and that M.B.'s ability to start a parenting class was delayed by class unavailability. Further, M.B. made an effort to maintain contact with her children with letters/ cards/gifts, made two separate trips from Auglaize County to Erie County to visit with her children in the last review period, had positive visits with the children, made a third visit to Erie County in the last review period to visit the children/attend the permanency review, and one of the siblings expressed a desire to return to her mother.
> 2. The Juvenile Court committed an abuse of discretion and/or error of law when it identified non-relative confidential foster parents as the adoptive resource for the child despite the existence of suitable and willing biological relatives, namely [Grandparents].
> 3. The Juvenile Court's determination that the child's interests are best served by adoption by the confidential foster parents, not [Grandparents], is contrary to the evidence. Specifically, the evidence demonstrated that [Grandparents] are the child's maternal grandparents, maintained consistent contact with the Agency throughout the child's placement, passed a home study, have visited on multiple occasions with the child in Erie (despite residing in Ohio), have attempted to maintain phone contact with the child, and can now assure the child's safety.

(Mother's Concise Statement of Errors Pursuant to Pa.R.A.P.(B) for Docket Nos. 127 – 2013, 128 – 2013, and 129 – 2013 at ¶ 1-3).

---

6 In M.B.'s "Concise Statement of Errors Pursuant to Pa.R.A.P. 1925(B)" for Docket Number 127 of 2013, referencing H.B., this statement of error is modified to reflect that the change of goal to adoption for H.B. was made after a five month review period.

24

A-92

In her "Concise Statement of Errors Pursuant to Pa.R.A.P.(B)" for Docket Number 130 of 2013, in reference to B.G.B., Mother includes the same statements of error listed above verbatim at Paragraphs 1, 3 and 4. (*See* Mother's Concise Statement of Errors Pursuant to Pa.R.A.P.(B) for Docket No. 130 – 2013 at ¶ 1, 3-4). Mother also adds one additional statement of error:

> The Juvenile Court committed an abuse of discretion and/or error of law when it denied the guardian ad litem's request to speak directly to the nine-year-old child about whether she desired to return home to her mother.

(Mother's Concise Statement of Errors Pursuant to Pa.R.A.P.(B) for Docket No. 130 – 2013 at ¶ 2).

In Father's "Statement of Errors Complained of on Appeal" at each of the above dockets, he raises the identical four issues on appeal:

> 1. The trial court erred in changing the goal to adoption because the testimony and evidence presented at the time of the hearing was insufficient to support such a change.
> 2. The trial court erred by finding that the Appellant was not compliant with his family service plan because the testimony and evidence presented at the time of the hearing was insufficient to support such a finding.
> 3. The trial court erred in admitting hearsay evidence as proof of Appellant's non-compliance with his family service plan, specifically, the out-of-court statements of Auglaize County Social Service Supervisor Michelle Brown.
> 4. The trial court erred to the extent that it relied upon the Appellant's asserted non-compliance with his Auglaize County family service plan as proof of non-compliance with his Erie County family service plan, given that, at the time of the hearing, an adjudication/disposition had yet to be held in Auglaize County.

(Father's "Statement of Errors Complained of on Appeal" at ¶ 1-4).

For the reasons set forth below, each of the issues raised by Mother and Father lack both legal and factual merit and, therefore, the instant appeal should be dismissed.

A.    Change in Goal

Mother's first issue raised in her statement of errors at each docket and Father's first two issued raised in his statement of errors at each docket claim that the Court abused its discretion in

25

A-33

changing the permanency goal to adoption. Consequently, these issues will be addressed together.

Specifically, Mother argues in her first issue that "[t]he Juvenile Court committed an abuse of discretion and/or error of law when it determined that the concurrent permanency goal of reunification/adoption was no longer feasible, dispensed with the concurrent goal of reunification and directed the Agency to provide no further services and/or visitation to M.B." (Mother's Concise Statements of Errors Pursuant to Pa.R.A.P.(B) at ¶ 1). Similarly, Father argues in his first issue that "[t]he trial court erred in changing the goal to adoption." (Father's "Statement of Errors Complained of on Appeal" at ¶ 1).

Additionally, both parties contest this Court's findings that the parties were minimally compliant or simply noncompliant with the permanency plan. Specifically, Mother argues:

> [T]he testimony reveals that [Mother] made an effort to commence services in Auglaize County, Ohio in the last review period, that [Mother's] ability to participate in a psychological evaluation was hindered by the Erie County Agency's delay in coordinating funding with Auglaize County, and that [Mother's] ability to start a parenting class was delayed by class unavailability. Further, [Mother] made an effort to maintain contact with her children with letters/ cards/gifts, made two separate trips from Auglaize County to Erie County to visit with her children in the last review period, had positive visits with the children, made a third visit to Erie County in the last review period to visit the children/attend the permanency review, and one of the siblings expressed a desire to return to her [Mother].

(Mother's Concise Statements of Errors Pursuant to Pa.R.A.P.(B) at ¶ 1).

Similarly, Father argues in his second issue, "[t]he trial court erred by finding that the Appellant was not compliant with his family service plan because the testimony and evidence presented at the time of the hearing was insufficient to support such a finding." (Father's "Statement of Errors Complained of on Appeal" at ¶ 2).

26

The Court first notes the relevant standard of review as set forth by the Pennsylvania

Superior Court as follows:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re N.C.*, 909 A.2d 818, 822-23 (Pa. Super. 2006) (citations and quotation marks omitted).

The Court changed the permanency goal of the child pursuant to the Juvenile Act, 42

Pa.C.S. § 6301 *et seq.* Specifically, Section 6351(e) of the Juvenile Act provides:

> (1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court.

Further, Sections 6351(f), (F.1) and (g) provide:

> (f) *Matters to be determined at permanency hearing.* At each permanency hearing, a court shall determine all of the following:
>
> > (1) The continuing necessity for and appropriateness of the placement.
> > (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

27

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

(8) The services needed to assist a child who is 16 years of age or older to make the transition to independent living.

(8.1) Whether the child continues to meet the definition of "child" and has requested that the court continue jurisdiction pursuant to section 6302 if the child is between 18 and 21 years of age.

(8.2) That a transition plan has been presented in accordance with section 475 of the Social Security Act (49 Stat. 620, 42 U.S.C. § 675(5)(h)).

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

For children placed in foster care on or before November 19, 1997, the county agency shall file or join a petition for termination of parental rights under this subsection in accordance with section 103(c)(2) of the Adoption and Safe Families Act of 1997 (Public Law 105-89, 111 Stat. 2119).

(10) If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that

28

A-71

sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(f.1) *Additional determination.* --Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

(g) *Court order.* --On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

This Court is also mindful of our Superior Court's directive that "[t]he trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents." *In re. S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008); *see also In re. A.K.*, 936 A.2d 528, 599 (Pa. Super. 2007) (stating "[the] statutory mandates clearly place the trial court's focus on the best interests of the child.").

29

Further, a review of the relevant case law reveals that, even when a parent substantially complies with a permanency plan, a change of goal to adoption remains appropriate when it is in the best interests of the child. In the case of *In re. N.C.*, 909 A.2d 818 (Pa. Super. 2006), the Superior Court acknowledged that the Mother "had substantially completed her permanency plan," but nevertheless concluded "Mother's parenting ability remained problematic" and affirmed the trial court's order changing the permanency plan from reunification to adoption. *Id.* at 826. Similarly, in *In re. S.B.*, *supra*, our Superior Court affirmed the trial court's order changing the permanency plan from reunification to adoption, stating "S.B.'s emotional state has not improved to a level that would allow her to be placed with either parent. S.B.'s safety and emotional stability controls the current analysis, even in light of the parents' substantial compliance." 943 A.2d at 981.

In the instant case, the Court considered the factors listed at 42 Pa.C.S. § 6351. (*See* July 17, 2014 Orders of Court). Firstly, the Court found that no significant progress has been made at alleviating the circumstances necessitating the original placement. Principle among the circumstances is stability in housing. Within a period of one year Mother and Father had five residences outside of Erie, Pennsylvania: the Dearborn, Michigan residence; the Knight's Inn motel in Monroe, Michigan; the apartment in Monroe, Michigan; the Second Street residence in Sandusky, Ohio; and the trailer at Townline-Kossuth Road in St. Mary's, Ohio. A year previous to that the parents had at least four addresses in Erie, Pennsylvania: the Athens Street residence; the Kelso Drive residence; the Allegheny Avenue residence; and West 24th Street residence. Further, at the July 9, 2014 Review Hearing, Mother admitted that she does not have suitable living arrangements for the children. She testified that she still lives at the trailer at Townline-Kossuth Road in St. Mary's, Ohio, and that it is not "appropriate housing for [her] and for the

30

Λ 7P

kids." (N.T. July 9, 2014 Permanency Hearing at 34). Previous to the July 9, 2014 hearing, Mother and Father continued to give OCY conflicting answers as to their plans for housing, stating at different times they would live in either St. Mary's, Ohio, Sandusky, Ohio or return to Erie, Pennsylvania. (*See* July 9, 2014 Court Summary at 8). Additionally, Mr. Parmerter testified that Father had provided probation staff in Monroe County the Second Street address in Sandusky, Ohio as the primary residence for himself and Mother. (N.T. July 9, 2014 Permanency Hearing at 7).

Another concern of this Court has been the influence of Father. Father has demonstrated violent tendencies, which formed the basis of the dependency petitions and which were testified to by A.B., the maternal grandmother. Grandmother testified that she was afraid of Father, and afraid he would take the children. (N.T. July 9, 2014 Permanency Hearing at 53). She also testified that Father did not permit her to see the children before they were taken into the custody of OCY. (*Id.* at 54). Currently, both B.G.B. and R.B. III are in trauma-focused therapy due to their experiences of verbal abuse by Father. (*See* July 9, 2014 Court Summary at 2-3).

Mother remains in a state of denial regarding Father. She gave evasive answers as to whether she continued to reside with Father at the Townline-Kossuth address. (*See* N.T. July 9, 2014 Permanency Hearing at 39-40). She remains in denial regarding the alleged domestic abuse that has taken place in the home. When she first completed a domestic abuse evaluation, she self-reported no problems. (*Id.* at 11). She had to return for a second evaluation because the staff at Maryhaven "felt that [Mother] was not being honest when she took it the first time." (*Id.* at 25). Mother did testify that she would be willing to leave Father if it was in the children's best interests. (*Id.* at 37). The Court finds this testimony to be incredible and self-serving. Mother has previously testified falsely that she was not living with Father. (N.T. April 25, 2014

31

Adjudication/Dispositional/Review Hearing at 46). From the first Shelter Care Hearing until Father was detained in Ohio, Mother consistently maintained that she was not living with Father and did not know where he was. (*See* N.T. September 26, 2013 Shelter Care Hearing at 5). However, Mother was reportedly frequently seen with Father and H.B. at a pawn shop in Ohio and was subsequently found with Father and H.B. when the U.S. Marshals investigated the Townline-Kossuth Road residence in St. Mary's, Ohio. (*See* March 26, 2014 Adjudication/Dispositional Hearing Court Summary at 5). Consequently, the circumstances which necessitated the placement of the children – the lack of suitable housing and the negative influence of Father in the children's lives – have not been alleviated. The parties stand in the same place as one year ago, when B.G.B. and R.B. III were first detained by OCY.

Secondly, Mother and Father have not been adequately compliant with their treatment plans. Neither was invested in following through with the necessary steps set forth in the treatment plan to achieve the goal of reunification. Mother has only appeared personally at two hearings: the first Shelter Care Hearing on September 23, 2013 and the Permanency Hearing on July 9, 2014. Both Mother and Father appeared telephonically at the April 25, 2014 Adjudication/Dispositional/Review Hearing. Father has never appeared personally before the Court. He did participate by telephone on one occasion but only spoke in a limited capacity because of pending criminal charges. The parents had from October 23, 2013, the first Dispositional Hearing for B.G.B. and R.B. III, until the July 9, 2014 Permanency Review Hearing for all of the children to demonstrate to the Court that the children would be safe and in a stable home environment if returned to their care through the completion of their treatment programs. OCY worked with the Auglaize County CSU to coordinate a treatment plan with them that Mother and Father could utilize while residing in St. Mary's, Ohio. Mother did not

32

A-40

begin to comply with her treatment program until sometime in April 2014, when she completed a domestic violence evaluation and a drug and alcohol evaluation. (N.T. April 25, 2014 Adjudication/Dispositional/Review Hearing at 30). By the time of the July 9, 2014 hearing before this Court, Mother had completed a second domestic violence evaluation. (N.T. July 9, 2014 Permanency Hearing at 25). Mother maintained the only reason she has not completed a psychological evaluation is because she has been waiting on OCY to arrange for the financing of one. (*Id.* at 32-33).

Father has done nothing to comply with his treatment program. In his second issue raised on appeal, Father argues that "the testimony and evidence presented at the time of the hearing was insufficient to support such a finding." (Father's Statement of Errors at 2). However, Mr. Parmerter testified that Father had not been compliant with the treatment plan. (July 9, 2014 Permanency Hearing at 17). Further, Father had only contacted OCY once. (*Id.* at 19). Father introduced no evidence to rebut Mr. Parmerter's testimony. On cross-examination, Father elicited testimony from Mr. Parmerter that a treatment plan was not established until shortly after the April 25, 2014 hearing because Father had been unavailable. (*Id.* at 17-18). Consequently, Father had at least two months to demonstrate some compliance with the treatment plan. He has provided no evidence of such compliance. Also, no treatment plan was ever put into effect for Father because he had never appeared or made himself available for any of the Court hearings. Therefore, his second issue raised on appeal is without merit.

Most importantly, neither Mother nor Father has shown adequate interest in the children's well-being. Father has not seen any of the children since H.B. was taken into custody in February of 2014. He has not seen B.G.B. or R.B. III since they were taken into custody by OCY in September of 2013. He did not maintain any contact with them until after February of 2013

33

A-41

when telephone contact was established with the children. However, this contact had to be suspended because it was distressful for R.B. III because Father would become aggressive on the telephone. Father was unable to see the children for most of this time because he was evading law enforcement and subsequently had extradition proceedings in Ohio for his criminal charges in Michigan. Significantly, Father's parental kidnapping charges were directly related to the circumstances which necessitated the placement of the children, namely, Father's attempts to elude law enforcement and children protective services with H.B. Father cannot now use the consequences of his criminal activity, wherein the children were victims, as an excuse for his failure to maintain contact with the children.

Mother has similarly failed to show adequate interest in the children. She did appear for the first Shelter Care hearing on September 23, 2013. However, both OCY and her Court-appointed attorney had difficulty maintaining contact with Mother after the hearing. Mother failed to appear at each of the subsequent hearings until the April 25, 2014 hearing. This was because Mother was held in Monroe County, Michigan on parental kidnapping charges and subsequently joined Father in Auglaize County, Ohio when he was attempting to elude law enforcement for his own child kidnapping charges. After the U.S. Marshal Services located the family at the campground on Townline-Kossuth Road in Auglaize County, Mother "maintained some contact with [OCY] via phone but has shown little interest in the other children in that, [sic] she has not inquired about their health, schooling, or overall wellbeing." (March 26, 2014 Review Hearing Court Summary at 9). Subsequent to the April 25, 2014 hearing, Mother did complete three visits with the children, which were appropriate. However, Mother's final hour attempts to demonstrate her interest in her children cannot excuse her previous failures to show adequate interest in her children.

34

It is important to recognize that the change of goal to adoption should not have come as a surprise to Mother or Father. At the dispositional hearings where the permanency goal was established for each of the children, the Court set a goal of reunification with parents *concurrent* with adoption. The concurrent goal of adoption was recognized because of the previous history of Mother and Father with children services in Ohio and Michigan, their lack of stable housing and a history of domestic violence.

The history of this case presents two parents whose self-interest in avoiding law enforcement and child protective services trumped their interest in the children's well-being. In their effort to avoid law enforcement, both Mother's and Father's transient lifestyle has directly placed D.B. and H.B. in a threat of harm and totally neglected B.G.B. and R.B. III while they remained in the custody of OCY. Due to the parents' actions, B.G.B. and R.B. III suffer from post-traumatic stress disorder and are significantly behind in schooling. (*See* July 9, 2014 Court Summary at 2-3). B.G.B. has particularly suffered, as she is three grade levels behind in school and has "grown frustrated and given up trying." (July 9, 2014 Court Summary at 2). Now, with mandated placement through OCY, the children's lives have stabilized, their mental health diagnoses are being treated, they are advancing in school, and they have established a bond with their foster parents. Consequently, the change of goal to adoption is in the children's best interests. Therefore, even if Mother and Father have been in substantial compliance with their treatment plans, the change of goal to adoption would still be appropriate in this case. *Cf. In re. N.C., supra.* For these reasons, Mother's and Father's issues challenging this Court's determination to change the goal to adoption are without merit.

35

B.    Testimony of B.G.B.

In Mother's third issue raised at Docket Number 130 of 2013, she argues:

The Juvenile Court committed an abuse of discretion and/or error of law when it denied the guardian ad litem's request to speak directly to the nine-year-old child about whether she desired to return home to her Mother.

This issue is also without merit. At the July 9, 2014 hearing, Attorney Owen indicated that he had "received some information that [B.G.B] was interested in returning to her Mother." (July 9, 2014 Permanency Hearing at 57). However, Attorney Owen did not receive this information directly from B.G.B. Attorney Owen stated, "[S]he did not tell me that when I spoke to her again today." (*Id.*). Consequently, the Court asked Attorney Owen to assume B.G.B. wanted to return to Mother, and asked whether returning B.G.B. to Mother was in B.G.B.'s best interests. The following exchange with counsel ensued:

> The Court: If she's telling you she wants to go back with mom and we know [Father] is still in the house, would that be in her best interest?
> Attorney Owen: She's not the one that told me that. That's my ultimate concern. I think in the best interest it's clear that we should go to adoption on all four. If I had one concern it was that, and I think we can resolve that quickly with a conversation, that's all.
> The Court: Conversation with [B.G.B.]?
> Attorney Jones: No, I don't think you should put it on a nine-year-old.
> The Court: I don't think it's going to change.
> Attorney Owen: That's fine.

(*Id.* at 57-58).

The Court recognizes that the express wishes of a child constitute an important factor that must be carefully considered in determining the child's best interest. *See In re. D.P.*, 972 A.2d 1221, 1232 (Pa. Super. 2009) (quoting *Ketterer v. Seifert*, 902 A.2d 53, 540 (Pa. Super. 2006)). Moreover, the Court must also take into account the child's age and maturity. *Id.* (citing 42 Pa.C.S. § 6351(e)(1).

36

In the instant case, the Court assumed that B.G.B. wanted to return to Mother's care and asked her guardian ad litem how that would affect her best interests. Attorney Owen replied that, despite B.G.B.'s desire to return to Mother, the proposed change of goal to adoption would be in her best interest. The Court considered the other factors enumerated in Section 6351 of the Juvenile Act and determined that B.G.B.'s alleged wish to return to her Mother would not change its analysis. (*See* July 17, 2014 Order of Court at Docket No. 130 of 2013). Consequently, B.G.B.'s testimony was irrelevant. Mother's third issue at Docket Number 130 of 2013 is without merit.

C.    Maternal Grandparents As an Adoptive Resource

Mother also raises the following two issues at each of the above dockets:

The Juvenile Court committed an abuse of discretion and/or error of law when it identified non-relative confidential foster parents as the adoptive resource for the child despite the existence of suitable and willing biological relatives, namely [Grandparents].

The Juvenile Court's determination that the child's interests are best served by adoption by the confidential foster parents, not [Grandparents], is contrary to the evidence. Specifically, the evidence demonstrated that [Grandparents] are the child's maternal grandparents, maintained consistent contact with the Agency throughout the child's placement, passed a home study, have visited on multiple occasions with the child in Erie (despite residing in Ohio), have attempted to maintain phone contact with the child, and can now assure the child's safety.

The record reveals that the maternal grandparents, Do.B. and A.B., were considered as a kinship resource shortly after dependency proceedings began. (*See* October 23, 2013 Court Summary at 8). Because Grandparents live in Ohio, OCY initiated the process for an Interstate Process. (January 22, 2014 Court Summary at 4). A home study was also completed. (N.T. July 9, 2014 Permanency Hearing at 12). However, Grandparents informed OCY that they did not

want to be considered as kinship resources because "they would not be able to keep the children safe from [Father]" and Grandmother's concern that "when H.B. would be graduating [Grandmother] would be 80 years old." (*Id.*). Consequently, the Interstate Compact process was not completed.

At the July 9, 2014 hearing, Mother called Grandmother to testify. Grandmother was asked the following questions on cross-examination:

> Attorney Jones: So, ma'am, you don't deny saying that you were afraid of [Father]?
> Grandmother: Yeah.
> Attorney Jones: And afraid of [Father] taking the children?
> Grandmother: Um-hum.
> Attorney Jones: And were you also afraid of your daughter taking the children?
> Grandmother: Yes.

(N.T. July 9, 2014 Permanency Hearing at 53).

When asked if she was still afraid of Mother, she avoided the question and replied "I believe she has really triumphed and is really trying to do what is appropriate to get her kids back to her." (*Id.*). Similarly, in reference to Father, Grandmother stated "Well, we have a security system . . . And I don't think [Father], if I can be very blunt, would have the guts to try to come out." (*Id.* at 50). Grandmother did not address her age, but stated the reason she withdrew herself from consideration as a kinship resource was because of an automobile accident. (*Id.*). She claimed that her "doctor has signed, [she is] fine now, there is no problems [*sic*]." (*Id.*). However, Grandmother also testified that only B.G.B. has spent the night in her home once. (*Id.* at 49). Grandmother claimed that Father had prevented her from seeing the children. (*Id.* at 54).

This Court determined that Grandmother's testimony was insufficient to demonstrate that it was in the children's best interests to be placed in Grandmother's and Grandfather's care.

38

Grandmother did not address her previously stated concern for withdrawing due to her age, which was based on her future ability to care for the children. Instead, she addressed her recovery from her automobile accident, which established her current physical ability to care for the children and was never in question. More importantly at issue is Grandmother's and Grandfather's ability to protect the children from Father. Grandmother's response to this concern, her new security system, is insufficient. The concern was never that Father would break into the home to kidnap the children. Rather, the concern was that Father and Mother would use their relationship with Grandparents to manipulate them into giving them access to the children.

This concern is highlighted by Grandmother's alleged role in perpetuating Mother's and Father's efforts at evading law enforcement when the authorities were searching for Father and H.B. According to the March 26, 2014 Court Summary, OCY "made numerous contacts throughout Michigan and Ohio and learned there was a bank account in the name of [R.B. III], the child, and [Mother] was receiving money from [Grandmother] to keep herself financially afloat." (March 26, 2014 Adjudication/Dispositional Court Summary at 5). This episode illustrates that Grandmother is vulnerable to manipulation by Mother and/or Father, which may be contrary to the best interests of the children. It was also not lost on the Court that Grandmother had also previously stated she was fearful that both Mother and Father would take the children from her and her husband. (July 9, 2014 Permanency Hearing at 53). Considering this background, Grandmother's testimony was insufficient to establish that the children would be protected from Father while in Grandparents' care.

Significant to the Court's determination was that of all the children, only B.G.B. had ever spent time in Grandparents' home. Further, B.G.B. had only spent *one* night in their home.

39

However, the children have spent several months with their foster parents and are comfortable in the home and have also thrived in the foster home. Grandparents have made an effort to continue their relationships with the children. They have travelled at least three times from Sandusky, Ohio to visit the children in Erie, Pennsylvania. The Court indicated that it would be appropriate for Grandparents to maintain contact with the children post-adoption. (July 9, 2014 Permanency Hearing at 52, 58). However, there was insufficient evidence to establish that it is in the children's best interests to be placed in Grandparent's care. Consequently, Mother's final two issues at each of the above-referenced dockets are without merit.

D.   The Auglaize County Child Services Unit (CSU) Letter

In Father's final two issues at each of the above-referenced dockets, he argues:

The trial court erred in admitting hearsay evidence as proof of Appellant's non-compliance with his family service plan, specifically, the out-of-court statements of Auglaize County Social Service Supervisor Michelle Brown.

The trial court erred to the extent that it relied upon the Appellant's asserted non-compliance with his Auglaize County family service plan as proof of non-compliance with his Erie County family service plan, given that, at the time of the hearing, an adjudication/disposition had yet to be held in Auglaize County.

(Father's "Statement of Errors Complained of on Appeal" at ¶ 3-4).

At the beginning of the July 9, 2014 hearing the Court moved to make a letter from the Auglaize County CSU, describing Mother's and Father's compliance with their treatment plan, a part of the record. (July 9, 2014 Permanency Hearing at 4). The letter was made a part of the record without objection. (*Id.*) Subsequently, Mr. Parmerter testified that he had spoken with the Auglaize County CSU caseworker concerning Mother's and Father's compliance. (*Id.* at 9). He relayed that "there has been very limited participation with their treatment plan, and that [Father] had threatened some of their staff, had been seen following some of their staff . . . to the point

40

where anytime they have visitation or anything they are accompanied by sheriffs, because their staff had concerns that he was going to perpetrate violence." (*Id.*). There was no objection to this testimony. Mr. Parmerter also testified that Father has not "done anything on the treatment plan or in any way demonstrated that he's appropriate to safely parent [the] children . . ." in the past ninety days or at any point in time while Mr. Parmerter was assigned to the case. (*Id.* at 10). Further, Mr. Parmerter testified Father has done nothing proactive to get himself involved in the treatment plan. (*Id.* at 19).

It is axiomatic that "[f]ailure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal." *Commonwealth v. Pearson*, 685 A.2d 551, 555 (Pa. Super. 1996) (citing Pa.R.A.P. 302(a); *Commonwealth v. Burkholder*, 595 A.2d 59 (Pa. 1991)). Father failed to raise a contemporaneous objection to the admission of the letter from Auglaize County CSU. Consequently, Father's third issue is waived.

Assuming *arguendo* that Father's third issue is not waived, it is also without legal merit. The Pennsylvania Rules of Juvenile Court Procedure explicitly provide that at a permanency hearing:

> *any* evidence helpful in determining the appropriate course of action, *including evidence that was not admissible at the adjudicatory hearing*, shall be presented to the court.

Pa.R.J.C.P. 1608(C)(1) (*Emphasis* added).

In the instant case, the letter from Auglaize County CSU was helpful because Father remained in Auglaize County, Ohio during the course of the review period, had a child in the protective custody of Auglaize County CSU, and OCY was coordinating with Auglaize County CSU to offer Father a treatment plan. Additionally, Father failed to appear at the hearing and did not provide a telephone number where he could be reached. Consequently, Father could not

41

A_46

speak for himself. The Auglaize County CSU letter, therefore, was not only helpful, but necessary for the Court to understand Father's status and efforts, if any, to reunite with his children. The Auglaize County letter was helpful and, therefore, admissible pursuant to Pa.R.J.C.P. 1608(C)(1), even if it would not have been admissible at the adjudicatory hearing. Father's third issue is without merit.

Next, Father argues, in effect, that this Court could not consider his failure to comply with the treatment plan coordinated between the Auglaize County CSU and OCY because there was no adjudication and disposition in the dependency case regarding his infant daughter C.B. (*See* Father's "Statement of Errors Complained of on Appeal" at ¶ 4). This argument is also without factual or legal merit. As set forth above, the Court's determination to change the placement goal to adoption was Father's history of verbal abuse, lack of stable housing, and failure to show any interest in the well-being of his children. Therefore, even if the Auglaize County CSU failed to provide Father with a treatment plan, it would be inconsequential to the outcome of this case. Even before the implementation of a treatment plan between the Auglaize County CSU and OCY, Father failed to show any interest in the dependent children at issue in this case. Further, if a treatment plan was never put into place, it was Father's responsibility to contact OCY and inquire into the well-being of his children. Father did so only once. (July 9, 2014 Permanency Hearing at 19). Consequently, Father's noncompliance with the treatment plan established by the Auglaize County CSU was not the overriding factor in this Court's determination to change the placement goal to adoption. His total noncompliance with the current treatment plan provided by OCY for Father to reunify with the four dependent children provided the basis for the change of goal to adoption. Father's final issue is, therefore, without merit.

42

A-50

## CONCLUSION

For the reasons set forth above, the issues raised by both Mother and Father at each of the above-referenced dockets are without merit. Therefore, the instant appeals should be dismissed.

BY THE COURT:

John J. Trucilla, Administrative Judge

cc:     Amy E. Jones, Esquire
        Jason R. Owen, Esquire
        Jessica A. Fiscus, Esquire
        Steven E. George. Esquire

43

A-51